CROWN COACH COMPANY, ET AL., *v.* GIBSON.

4-5209 120 S. W. 2d 702.

Opinion delivered October 31, 1938.

*Thomas B. Pryor* and *W. L. Curtis, Miles, Armstrong & Young,* for appellant.

*Partain & Agee,* for appellee.

GRIFFIN SMITH, C. J. Judgment for $2,000 was rendered to compensate damages appellee alleges he sustained when Missouri Pacific Transportation Company refused to allow him to take passage on its bus at Mulberry and go to Little Rock on a ticket issued at Fayetteville by Crown Coach Company.

Appellee testified that he was a World War veteran, 42 years of age; that he had not been classified for connected service compensation, his disability being rated at less than ten per cent.; that in 1937 he spent from January to April in the Veterans' Hospital at Fayetteville, and was discharged, the general condition of his health at that time being good. Before leaving the hospital appellee was given a voucher entitling him to bus transportation. He presented the voucher to Crown Coach Company's agent at Fayetteville and received a ticket. The agent kept that part of the ticket designating the route.

It was shown that Crown Coach Company's buses ran from Fayetteville to Little Rock, via Alma and Fort Smith. Missouri Pacific Transportation Company buses operate from Fort Smith to Little Rock via Alma.

Appellee testified that when the Crown Coach bus reached Alma the driver told him to change for Little Rock. In response to the driver's direction to get off the bus, appellee did so. His wife lived with her mother six miles northeast of Alma. Appellee testified:

"I reached Alma around two o'clock in the afternoon. . . . The bus left there at 7 o'clock that night. There may have been one before that. I was feeling bad and intended to spend the night with my wife until the next night. Next morning my wife brought me back to the station at Alma. Said she had to go to Mulberry. I asked the agent if I could go to Mulberry and catch the bus there, and he said it would be all right. We drove to Mulberry in a 1931 Chevrolet sedan, arriving about noon. I told my wife good-bye and waited on the bus. When it came I presented my ticket to the bus driver and he wouldn't accept it. I asked him why, and he said it wasn't signed. I then had a talk with Mr. Cushenberry about it. He was the agent at Mulberry. Mr. Jackson [township constable] came up and called the agent at Alma. Then Jackson and Cushenberry had another conversation with the driver, and when they got through talking he said I would have to go back to Alma and catch the bus,

"I waited there an hour and a half, and had a chill. I had Mr. Hawkins call my wife. She came back and drove me up to the station at Alma. I asked [the agent], Mr. Brown, about the ticket and he told me that he told the driver to let me on. I had to wait there until seven o'clock that night to get a bus and when the bus came the driver accepted the ticket. It was a Missouri Pacific bus. Mulberry is a regular station for Missouri Pacific buses. [While in Mulberry] I didn't have any money to buy transportation—I didn't have one nickel. Mr. Jackson paid for the call up to Alma. I tried to get a ride back up there. It snowed and turned cold. I had never had a chill before in my life. I got sick and shaking all over. I never had a cold like that. In Mr. Brown's cafe [in Alma] people would come in and ask what was wrong. The bus got to Little Rock about one o'clock—after twelve o'clock. I got a taxicab and went home and my mother paid him when I got there. I had a hard rigor. My mother called a doctor."

"Q. Has anything happened to you by being out there? A. My physical condition is bad. I have bladder trouble and inflammation of the prostate; had to have a rectal operation. Had to go back and have it cut out again. [Before going back to the hospital] I was in bed two weeks, and about three weeks after I got up. I returned to the hospital June 1 and have stayed there until now [November 22, 1937]. I had five operations in nine months. I think two of the operations are considered major operations. I had sinus trouble and they had to give me treatment—and they thought I was going to have pneumonia. I suffered all the way home [from Alma]. I am in pain right now. I owe Dr. A. C. Gray [for treating me] fifteen days, $45. By reason of my war service the other doctor bills have been paid by the government. Dr. Gray is 67 years old. He is not here [to testify]. He couldn't get here on account of his age and bad weather —he was afraid to come."

Appellee testified on cross-examination that he did not "contact" the agent at Alma when he got off the Crown Coach bus, but told the agent he had a ticket to Little Rock.

"Q. Did you show him the ticket at that time? A. I had it in my hand."

Appellee also testified on cross-examination that a Mr. Whitlock drove him to his wife's home. It was about nine o'clock when they got there. He said: "It was nice weather. It turned off summer time. The remark was made that it was unusual weather for April."

Asked how many times he had been in a hospital, appellee replied: "I have spent half of my time since I have been out of the army in hospitals."

"Q. Did you see anything on the ticket that called for transportation over two lines? A. As I remember, it said 'Crown Coach to Fort Smith and a Missouri Pacific to Little Rock.' Q. Didn't it say 'Crown Coach Company to Little Rock?' A. No, sir, I don't think so. Q. The Crown Coach Company didn't tell you to get off at Alma? A. He said, 'here is where you change for Little Rock.'"

There is testimony to the effect that the two bus companies had a working arrangement whereby tickets issued by one company would, if approved and indorsed by an authorized agent, be accepted by the other company and the accounts adjusted through interline settlements. Walter Brown, agent at Alma, represented both companies. When appellee presented the Crown Coach ticket to him, he authorized its use over Missouri Pacific Transportation Company's line, and it was accepted. Brown admitted having been called on the telephone from Mulberry by Bruce Jackson. "They called me about the ticket and I told them I didn't know what to do about it —that [the bus driver] could go ahead and take it if he wanted to; that I didn't know."

In view of the relationship existing between the bus companies, as shown by defense testimony not set out in this opinion, Brown had authority to direct acceptance of Crown Coach tickets by Missouri Pacific Transportation Company. Effect of Brown's testimony is that he did authorize use of the particular ticket. His statement was: "I told them I didn't know what to do about it— that [the bus driver] could go ahead and take it if he wanted to." Upon this authority the bus driver could have acted. A reasonable construction of the statement

would be that if the driver accepted the ticket he would be protected. We conclude, therefore, that appellee was wrongfully prevented from making the trip from Mulberry to Little Rock on the particular Missouri Pacific bus which left Mulberry "about three o'clock" the afternoon of April 4th.

The question is, Was this wrongful act the proximate cause of all or any appreciable part of the illness appellee and his witnesses testify he suffered?

By his own testimony appellee sheds light upon his physical status when he reached Alma about two o'clock April 3. He was "feeling bad and intended to spend the night with his wife." Thus the reason appellee gave for not taking the next Missouri Pacific bus after arrival of the Crown Coach which brought him from Fayetteville at 2:45, was that he was "feeling bad." In this condition he remained somewhere [interim time is not accounted for] more than six hours, for he says that he arrived at his wife's home about nine o'clock that night.

The following day—Sunday—Mrs. Gibson drove appellee to Mulberry. When he arrived there he was sick, for his witness, Constable Bruce Jackson, says: "I noticed [Gibson] talking to the bus driver. The driver said he couldn't take him until the ticket was o.k.'d. Gibson was nervous and shaking."

It cannot be said that either of the appellants was responsible for appellant's presence in Mulberry. He chose to be driven there by his wife. It is true he says Brown, the agent, told him he could get on a bus at Mulberry, but appellee does not say he showed Brown the ticket, or that Brown told him he could take a Missouri Pacific bus on the ticket appellee had in his hand. The most that can be inferred from appellee's own version of his conversation with Brown April 3 is that Brown told him bus facilities were available at Mulberry. This was true.

So, in addition to appellee's condition—"feeling bad"—when he arrived at Alma, he was "nervous and shaking" when he arrived at Mulberry on the 4th. Up to that time appellants had not inconvenienced or misdirected him. Notwithstanding appellee's contention

that he got off the bus at Alma in response to the driver's statement, he made no attempt to take the 2:45 bus. In explanation of this action, and in mentioning that another bus left Alma at 7 o'clock that night, appellee testified: "I was feeling bad and I *intended* to spend the night with my wife." It is possible, of course, to say that this "intent" was formed between the time appellee left Crown Coach Company's bus and time of arrival of the Missouri Pacific bus at 2:45. Possible, but not probable.

If we assume that appellee's "intent" to spend the night with his wife had been formed before he reached Alma, then the bus driver's directions to change for Little Rock had nothing to do with appellee's conduct in leaving the Crown Coach bus. If, however, we should conclude that such intent was formed in the short period of time involved, it must necessarily follow that the physical disability, or "bad feeling," of which appellee speaks, developed at the same time, and either continued until the next afternoon, or redeveloped as he reached Mulberry. On the latter point we have the constable's testimony.

Any view of the record discloses that after leaving the Crown Coach bus, appellee purposely refrained from taking passage on the 2:45 bus. He followed his own inclinations until near nine o'clock, and then drove to his wife's home, a distance of six miles; then back six miles the following morning, and then to Mulberry, an additional distance of eleven miles. This trip was made in a Chevrolet sedan—a closed car—and appellee returned from Mulberry to Alma in the same closed car.

Since getting "out of the army" appellee has spent half of his time in hospitals. He suffered from bladder trouble, inflammation of the prostate glands, and rectal disorders. In nine months he had five operations, two of which, he thought, were classified as major operations.

With this array of facts—most of which were testified to by appellee—can it be said that the wrongful act of the bus driver in refusing appellee passage from Mulberry, after the agent Brown had directed such driver to use his own discretion in accepting or refusing the ticket, was the proximate cause of the illness which followed?

The jury was justified in finding that appellee contracted a cold; that he suffered from chills, and that he was "threatened" with pneumonia, but there was an absence of substantial testimony that subsequent operations, and time spent in hospitals, were results of the mistreatment charged. While the realm of speculation has been invaded and explored in a most thorough and painstaking manner, yet all inferences that might conceivably attach to the series of facts and circumstances presented are not sufficient in substance to form a basis upon which proximate cause may rest.

The judgment may be affirmed for $100. If appellee, within fifteen days, will enter a remittitur of $1,900, the judgment will be affirmed; otherwise it will be reversed and the cause remanded for a new trial.

Mr. Justice Humphreys dissents as to the action of the court in reducing the judgment. Mr. Justice Mehaffy was absent and did not participate in consideration of the case.